**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3860-23

BEACH HAVEN AUTOMOTIVE, INC.,

    Plaintiff-Respondent,

v.

BOROUGH OF BEACH HAVEN,
BEACH HAVEN MUNICIPAL
COUNCIL, NANCY TAGGART DAVIS,
in her capacity as Mayor of the
BOROUGH OF BEACH HAVEN, and
BOROUGH OF BEACH HAVEN LAND
USE BOARD,

    Defendants-Appellants.

_____

Argued May 19, 2025 – Decided June 2, 2025

Before Judges Sabatino, Gummer and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2290-23.

M. James Maley, Jr., argued the cause for appellants (Maley Givens, PC, attorneys; M. James Maley, Jr., Emily K. Givens, and Erin E. Simone, on the briefs).

Steven E. Angstreich argued the cause for respondent (Weir LLP, attorneys; Steven E. Angstreich and Caroline J. Bojarski, on the brief).

PER CURIAM

This appeal concerns the trial court's application of two subsections of the Local Redevelopment and Housing Law ("LRHL"), N.J.S.A. 40A:12A-1 to -49. Specifically, the municipal defendants argue the court misapplied subsections (b) and (d) of Section 12A-5 of the LRHL, in ruling they had failed to show plaintiff's parcel met the criteria for designating it as an "area in need of redevelopment" under the statute.

For the reasons that follow, we affirm the court's finding that the evidence was insufficient to prove that the parcel, which had been vacated for approximately six months to accommodate environmental cleanup measures, met the criteria of subsection (d).

However, we remand this matter to the trial court to fully develop the record with respect to whether the parcel's apparent most recent use through January 2023 as a commercial storage facility without a use variance violated local zoning ordinances. If so, the trial court must reconsider whether that alleged improper use amounts to a "discontinuance" of the parcel's use within

2

the meaning of subsection (b) and, therefore, justified the municipality's redevelopment designation.

I.

Before we delve into the facts and procedural history, we provide this constitutional and statutory background for context.

Article VIII, Section 3, Paragraph 1 of the New Jersey Constitution authorizes the taking of private properties that are in "blighted areas" for redevelopment. The LRHL establishes statutory guidance for municipalities to exercise this authority.

The Legislature has stated that the goal of the LRHL is to enable municipalities to reverse "conditions of deterioration in housing, commercial and industrial installations, public services and facilities and other physical components and supports of community life, and improper, or lack of proper, development . . . ." N.J.S.A. 40A:12A-2(a) and (b). The LRHL aims "to promote the advancement of community interests through programs of redevelopment, rehabilitation and incentives to the expansion and improvement of commercial, industrial, residential and civic facilities." N.J.S.A. 40A:12A-2(b).

3

To that end, N.J.S.A. 40A:12A-5 sets forth the criteria for a property to be designated as an area in need of redevelopment. See Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 357 (2007). Once a property is designated as an area in need of redevelopment, the property shall be deemed a "blighted area" for which the municipality may exercise the power of eminent domain. N.J.S.A. 40A:12A-6(c); see also Malanga v. Twp. of W. Orange, 253 N.J. 291, 309-10 (2023). The designation also empowers a municipality to adopt a redevelopment plan for the area in accordance with N.J.S.A. 40A:12A-7.

When a municipality concludes that an area is in need of redevelopment pursuant to N.J.S.A. 40A:12A-5, that conclusion is entitled to a presumption of validity so long as it is supported by substantial evidence in the record. See Malanga, 253 N.J. at 314 (citing Gallenthin, 191 N.J. at 372).

That said, the municipality "must 'rigorously comply with the statutory criteria' to determine whether the property is in need of redevelopment." Ibid. (quoting 62-64 Main St., L.L.C. v. Mayor & Council of City of Hackensack, 221 N.J. 129, 156 (2015)). The record must contain "sufficient credible evidence that the designation satisfies the requirements of the LRHL." Ibid.

For that reason, "[c]ourts 'must review the complete record' to assess whether it contains substantial evidence to support a redevelopment

designation." Ibid. (quoting Hirth v. City of Hoboken, 337 N.J. Super. 149, 157 (App. Div. 2001)). If the municipality's decision is arbitrary, capricious or unreasonable, not supported by the evidence, or contrary to law, the court may set it aside. Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 378 (1996).

Here, as we will detail in our factual discussion in Part II, the municipal defendants found plaintiff's property satisfied the criteria of N.J.S.A. 40A:12A-5(b) and also, alternatively, N.J.S.A. 40A:12A-5(d).[1]

To satisfy subsection (b), the municipality must establish that:

> b. The discontinuance of the use of a building or buildings previously used for commercial, retail, shopping malls or plazas, office parks, manufacturing, or industrial purposes; the abandonment of such building or buildings; significant vacancies of such building or buildings for at least two consecutive years; or the same being allowed to fall into so great a state of disrepair as to be untenantable.
>
> [N.J.S.A. 40A:12A-5(b) (emphasis added).]

The statute does not define the term "discontinuance."

As a separate ground for designation, under subsection (d), the following areas also qualify:

> d. Areas with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding,

---

[1] The parties agree the other subsections of N.J.S.A. 40A:12A-5 for supporting a designation do not apply here.

faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are <u>detrimental to the safety, health, morals, or welfare of the community</u>.

[N.J.S.A. 40A:12A-5(d) (emphasis added).]

The statute does not define the phrase "detrimental to the safety, health, morals, or welfare of the community." Nor does it explain how that determination is to be made.

Our appellate review of the meaning of these statutory provisions at the heart of this case is de novo. <u>Wilson ex rel. Manzano v. City of Jersey City</u>, 209 N.J. 558, 564 (2012). "When courts interpret the meaning of a statute, the paramount goal is 'to determine and give effect to the Legislature's intent.'" <u>Malanga</u>, 253 N.J. at 310 (quoting <u>State v. Lopez-Carrera</u>, 245 N.J. 596, 612 (2021)).

In determining the statute's intent, courts look to the plain language. <u>Ibid.</u> And "[w]here a specific definition is absent, '[w]e must presume that the Legislature intended the words it chose and the plain and ordinary meaning ascribed to those words.'" <u>State v. Twiggs</u>, 233 N.J. 513, 532 (2018) (second alteration in original) (quoting <u>Paff v. Galloway Twp.</u>, 229 N.J. 340, 353 (2017)).

Further, a court should not examine the challenged portion of a statute in isolation but rather must consider the entire statutory scheme. See State v. Rangel, 213 N.J. 500, 509 (2013) ("We do not view words and phrases in isolation but rather in their proper context and in relationship to other parts of a statute, so that meaning can be given to the whole of an enactment."). However, "[w]hen the statutory language is ambiguous and 'leads to more than one plausible interpretation,' courts may resort to extrinsic sources, like legislative history and committee reports." Twiggs, 233 N.J. at 533 (quoting DiProspero v. Penn, 183 N.J. 477, 492-93 (2005)).

II.

With these principles in mind, we recount the factual record and procedural history of this case insofar as they are germane to our discussion.

The Property

Since 1972, plaintiff Beach Haven Automotive, Inc. has owned real property located at 1200 North Bay Avenue and 305 Twelfth Street in Beach Haven, also known as block 205, lots one and two ("the property"). The property is zoned in the "B" business district and, according to the municipal planner, may also be partially "transversed" in the RCB-Multifamily/Bay District. The

property was once a gas station and later an auto repair shop.[2]  Beginning at some unspecified time thereafter, the property was also used by a tenant for commercial storage.[3]

Environmental Contamination on the Site

In 1989, four underground storage tanks ("USTs") were discovered on the property.  In 1994, there was suspected discharge from one of the USTs, and a case was opened with the New Jersey Department of Environmental Protection ("NJDEP").  Since then, two additional USTs were discovered on the site in 2018 and 2021.  Plaintiff apparently took no action between 1994 and 2014 to manage or investigate the suspected contamination on the property.

In 2014, plaintiff retained a Licensed Site Remediation Professional ("LSRP") for the site.[4]  The record is uninformative about how much

---

[2]  It is unclear when the property ceased operating as a gas station and repair shop.  The record includes a comment by the Borough's mayor stating the gas station was abandoned in 1994.  A representative for plaintiff later stated plaintiff had purchased the property in 1972 as an automotive garage and that it was previously a gas station.

[3]  We will discuss the storage use, to the limited extent it is mentioned in the record, in Part III(B) of this opinion.

[4]  The Site Remediation Reform Act, N.J.S.A. 58:10C-1 to -29, enacted in 2009 established the LSRP program to oversee remediation of contaminated sites. N.J.S.A. 58:10C-14; see also Magic Petroleum Corp. v. Exxon Mobil Corp., 218

remediation work, if any, was carried out at that time. In March 2016, plaintiff, with the assistance of a different LSRP, first collected a groundwater sample from the property indicating there was contamination on the site and began monitoring it.

In December 2019, light non-aqueous phase liquids[5] ("LNAPLs") were identified in the soil. Between 2018 and 2022, plaintiff excavated over 59.97 tons of contaminated soil.

The ACO Between the NJDEP and Plaintiff

In February 2019, the NJDEP issued a notice of violation to plaintiff for failing to submit a timely remedial investigation report. The NJDEP thereafter filed a complaint in municipal court against plaintiff "for failure to remediate discharges of hazardous substances" on the property.

On February 4, 2022, the NJDEP and plaintiff entered into an Administrative Consent Order ("ACO") for the cleanup of the property. Plaintiff agreed under the ACO to remediate "all hazardous substances, hazardous

---

N.J. 390, 400 n.2 (2014) (noting LSRPs "are individuals who independently oversee the cleanup of contaminated sites, ensuring that the process is conducted effectively and in compliance with New Jersey Statutes and regulations").

[5] These are contaminants of gasoline, diesel, motor oils, and other similar substances.

wastes, and pollutants discharged" on the property. The ACO established a timeline for plaintiff to carry out the remediation, under the supervision of the LSRP. The ACO required plaintiff to submit a final remedial action report and a complete application for a groundwater remedial action permit by March 31, 2024.

The Five-Year Lease Through January 2023

Meanwhile, on January 26, 2018, plaintiff entered into a five-year lease of the property to a limited liability corporation. The lease broadly stated the premises "will be used [by the tenant] in accordance with all laws, rules, and regulations, and subject to local ordinances." The lease did not otherwise describe the tenant's use.

In January 2023, plaintiff retained a new LSRP. At that same time, plaintiff elected not to renew its lease with its tenant.

Actions By the Borough's Council and Land Use Board, and the Planner's Report

About five months later, on May 25, 2023, the Borough of Beach Haven's Council adopted resolution 121-2023, authorizing the Borough's Joint Land Use Board ("the Board") to conduct a preliminary investigation to determine whether the property should be designated an area in need of redevelopment pursuant to N.J.S.A. 40A:12A-5.

Frank J. Little, Jr., a licensed professional engineer and planner, prepared a report for the Board. Little visited the property and reviewed the Borough's tax maps, master plan, aerial photography from Google Maps, and the NJDEP compliance records. Little concluded the property satisfied the criteria under N.J.S.A. 40A:12A-5(d) because the property was "environmentally constrained and in need of remediation, which if not remediated, will be detrimental to the safety, health, morals, or welfare of the community." Little separately concluded the property satisfied N.J.S.A. 40A:12A-5(b) because his review indicated all uses of the property "were discontinued on or around July 2017 and the property . . . remained unoccupied and unutilized for nearly the past six years." He also noted that the building on the property was "dilapidated and unkempt" and warranted maintenance violations, although no citations had been issued.

Little later provided an addendum to his report, indicating plaintiff had provided information to him revealing a lease had been in place from January 2018 through January 31, 2023. However, Little still concluded the property satisfied N.J.S.A. 40A:12A-5(b) because "[t]he lease ha[d] expired, and the building [was] not being utilized for any purpose" as of the time of his report.

The Board held a public hearing on July 17, 2023. The Board heard from Little, who essentially reiterated the findings in his report. Plaintiff's counsel and the LSRP also appeared at the hearing.

Plaintiff's counsel objected to Little's conclusion that there had been a discontinuance of the property's use, pointing out there had been a lease for the property as recently as January 2023. Plaintiff's counsel explained that plaintiff had allowed the lease to expire because "the consultant had been going in to trench the building to get in there and try to see what was under the slab" beneath the building. Because it appeared plaintiff would need to work underneath the building, it needed unrestricted access to the premises which it could not have with a tenant nor the tenant's stored items occupying the building.

As to the contamination, the LSRP advised that additional groundwater monitoring and soil sampling had been conducted, but that the data from the testing had not yet been obtained. The LSRP stated the remediation process would be guided by what the data indicated about the site's contamination levels. The LSRP noted the NJDEP required two years of quarterly groundwater monitoring data. Thus, the NJDEP matter would remain open for at least an

additional two years. Plaintiff asserted, however, that this additional monitoring would not impact the use of the building.

After hearing the testimony, the Board voted to recommend the property be designated as an area in need of redevelopment. The Board's resolution adopted Little's conclusion that the property qualified for designation under N.J.S.A. 40A:12A-5(b) because its use had been discontinued when the most recent lease had expired in January 2023 and the building was not being utilized. The Board also concluded the property qualified under N.J.S.A. 40A:12A-5(d) because the property was contaminated and in need of remediation, which, if not done, would affect the safety, health, morals, or welfare of the community.

The Council's Resolution

On July 27, 2023, the Borough's council met and voted on the Board's recommendation. Although one council member requested the matter be tabled because plaintiff was taking the necessary steps to remediate the property, the remaining members agreed the property qualified as an area in need of redevelopment under both N.J.S.A. 40A:12A-5(b) and (d). Notwithstanding the designation, the council stated the Borough had no present intention of taking the property by eminent domain. Accordingly, the council adopted the

13

resolution, approximately six months after plaintiff had decided to cease leasing the premises.

Plaintiff's Lawsuit

In October 2023, plaintiff filed a verified complaint in lieu of prerogative writs in the Law Division against the Borough, the Municipal Council, the Land Use Board, and the Mayor (collectively, "defendants"). The complaint sought a repeal of the resolution (count one), a declaratory judgment invalidating the resolution (count two), a finding of a violation of 42 U.S.C. § 1983 (count three), a finding of a violation under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2, (count four), and injunctive relief (count five). The trial court thereafter denied plaintiff's request for preliminary restraints.

Defendants removed the lawsuit to federal court. The parties subsequently entered into a stipulation in which plaintiff agreed to voluntarily dismiss counts three and four of the complaint (the civil rights claims), and both parties consented to litigate the remaining claims in the Law Division. After the remand from the federal court, the trial court granted defendants a protective order precluding discovery.

Trial and the Court's Invalidation of the Designation

The parties appeared for trial on June 28, 2024. After hearing the parties' arguments but no testimony, the trial court ruled that defendants had not met their burden of establishing, by substantial evidence, that the property qualified under either N.J.S.A. 40A:12A-5(b) or (d) as an area in need of redevelopment. As a result, the court entered an order invalidating the resolution.

This appeal by defendants followed.

## III.

We address the two subsections relied upon by defendants one at a time. We begin with subsection (d), which can be dispensed with readily.

## A.

In finding that defendants had not sustained their burden of proof under subsection (d), the trial court essentially reasoned that plaintiff's active remediation of the property, under the direction and supervision of the NJDEP, weighed against it being deemed categorically "detrimental to the safety, health, morals, or welfare of the community." N.J.S.A. 40A:12A-5(d). We adopt and incorporate by reference the sound analysis of subsection (d) expressed in the trial court's thoughtful oral opinion. We add only a few brief comments.

In Malanga, in which the Supreme Court nullified a municipality's determination that an older library building containing asbestos was a property "in need of redevelopment," the Court instructed that subsection (d) requires: "(1) sufficient proof that areas with buildings or improvements suffer from one or more specified conditions; and (2) sufficient proof that, as a result of the particular condition or conditions, the areas 'are detrimental to the safety, health, morals, or welfare of the community.'" 253 N.J. at 312 (quoting N.J.S.A. 40A:12A-5(d)). The Court in Malanga underscored that subsection (d) "requires proof of a current problem, such as 'dilapidation,' 'obsolescence,' or 'overcrowding.'" Id. at 313. Further, subsection (d) "does not presume harm; it requires a showing of actual detriment." Ibid. (emphasis added). "[P]roof that a property is not used in an optimal manner or that it could function better is not an independent basis for redevelopment under subsection (d)." Ibid.

Here, the trial court reasonably concluded the Borough had failed to prove the current condition of the property was causing sufficient harm to the public to satisfy subsection (d). Although there is no dispute the property had been contaminated, there was no proven link between the contamination and a particularized harm to the community. There is no proof, expert or otherwise, that the contamination was in danger of affecting the Borough's water supply or

16

would cause residents to develop cancer as claimed by the Borough. Other than speculation about the potential risks posed by the property's contamination, there is no evidence in the record to support a finding that the property satisfied the criteria under subsection (d).

The court was unpersuaded the USTs that had been on the site posed a risk to the community. The court noted plaintiff had mitigated the soil contamination and was working with the LSRP to remediate the contamination in accordance with the ACO. Further, the LSRP testified the property was "safe" and the contamination had not "impacted surface water or drinking water." Although the court noted the mayor's comments at the hearing about health concerns, it qualified them as "general comment[s]," which were "not addressed to the specific detriment from the site."

In Malanga, the Court considered whether the presence of capped asbestos (among other conditions) was detrimental to the community under subsection (d). 253 N.J. at 322-23. The Court noted that, while the asbestos needed to be abated, the record showed the asbestos would not be disturbed unless there were renovations. Id. at 322. In the meantime, the property was safe for members of the public to visit. Id. at 322-23.

To be sure, we are mindful that petroleum leaks can pose a danger to the public health and welfare. See Howell Tp. v. Waste Disposal, Inc., 207 N.J. Super. 80, 91 (App. Div. 1986) (noting the Spill Act, N.J.S.A. 58:10-23.11 to -23.24, was enacted to protect "citizens from the discharge of petroleum products and other hazardous substances as a threat to the public health, safety and welfare"). Yet, as Malanga states, harm cannot be presumed under subsection (d); there must be a finding of actual harm. 253 N.J. at 319.

Here, the record contains no evidence of an active petroleum leak on the property—only that in April 1994 there was "suspected discharge" from one of the USTs on the property and in 2019, LNAPL was identified in one of the monitoring wells. And, while there is soil contamination, the extent of the contamination is unquantified in the record. Plaintiff's LSRP testified he had not yet received the soil data, which would guide the remediation process going forward. Further, the property did not "have very high concentrations of contaminants in groundwater," which suggested to the LSRP there was already natural attenuation occurring. Defendants presented no expert proof to rebut the LSRP's testimony.

The concern regarding impact to the Borough's water supply was not raised in Little's report or testimony. Rather, it was at the July 17, 2023 Board

meeting that one of the Board members raised this concern. Plaintiff's LSRP responded it would be unlikely any contamination would spread to the water wells because there was a "vertical barrier which prevents vertical migration of contamination downward" and "the contaminated material sits on top of that and doesn't migrate through that." In addition to being well below the contaminated materials, the Borough's water wells were located 0.7 miles away from the property.

In sum, the trial court reasonably concluded the Borough had not met its burden under subsection (d) to establish actual current harm. That said, the court's ruling is without prejudice to the Borough pursuing a new designation if material facts establishing present health hazards subsequently arise.

## B.

We also generally agree with the trial court's determination of insufficiency of proof under subsection (b), with one important exception.

We concur with the court that plaintiff has not "abandoned" the property, having leased it to a tenant for what the record indicates was an annual rental stream of over $30,000 for a five-year period and having expended substantial funds in remediation activities. Plaintiff reasonably explained why the building needed to be vacated while the remediation excavated underneath the

19

foundation. The property also was not proven to have been vacant "for at least two consecutive years" as specified in subsection (b). Nor was the property in "so great a state of disrepair as to be untenantable," at least through January 2023. Again, the trial court's decision is without prejudice, and the inability to lease or use the property productively becomes substantially more prolonged, the Borough may re-initiate the designation process.

We pause on affirming the court's subsection (b) determination, however, because it is not clear from the present record that the property was being used in a lawful manner by the previous tenant. Defendants contend the premises were being used for storage and argue that commercial storage was not a permitted use within the zone. Plaintiff does not deny the property was used for storage but contends that activity was permitted in the zone and did not require a variance.

The applicable ordinance provisions on this question are not entirely instructive. Code § 212-1 governs permitted uses in the Business District, where the property is located, and provides for the operation of:

> (2) Any retail shopping facilities or <u>service establishment which supplies commodities or performs a service primarily for residents of the surrounding neighborhood</u>, such as grocery stores, delicatessens, meat markets, drugstores, variety stores, antique and gift shops, furniture stores, bakery shops, restaurants,

20

luncheonettes, barbershops, beauty shops, clothes cleaning and laundry pickup establishments, banks, real estate offices, business or professional offices.

(3) Gasoline stations and public garages may be permitted as conditional uses . . . .

[and]

(4) Mixed uses consisting of the various permitted uses in this zone on the same property within one building subject to the provisions regulating same.

[Beach Haven, N.J., Code § 212-14(A) (emphasis added).]

Meanwhile, Section 212-14(B) expressly prohibits the following uses:

(1) Shipbuilding yards or ways; marine railways; machine shops; fish packing, shipping, canning, processing <u>or storage</u>; bottling plants; junkyards; airfields; landing bases; automobile wrecking yards; carpet-, rag- or bag-cleaning establishments; or any process of manufacture or treatment which is not clearly incidental to the retail business conducted on the premises.

(2) Carousels, roller coasters, merry-go-rounds, Ferris wheels or other mechanical rides; pony tracks; miniature golf courses; golf driving range; trampolines; and wild animal exhibits.

(3) Any type of business using jukeboxes or record players with external speakers to attract attention to the business being conducted within the premises.

(4) Any business using sidewalk displays.

21

(5) Trailers, trailer parks, dance halls and used car lots.

(6) Any process of assembly, manufacturing or treatment using power in excess of 25 total horsepower or constituting a nuisance by reason of odor, smoke or noise.

(7) Amusements or attractions of any sort, kind or description, except as may be permitted pursuant to § 48-8 of the Code of the Borough of Beach Haven.

(8) No building or structure shall exceed 35 feet nor three stories in height. . . .

(9) Heliports, helistops, and landing facilities for aircraft of all kinds are prohibited.

(10) Radio towers, telecommunications towers, towers for the transmission of high frequency or low frequency broadcast signals or towers used for the broadcast of ionizing or nonionizing radiation of any sort, kind or description.

(11) All classes of cannabis establishments or cannabis distributors or cannabis delivery services . . . , but not the delivery of cannabis items and related supplies by a delivery service.

[Beach Haven, N.J., Code § 212-14(B) (emphasis added).]

We note the above underscored clause in § 212-14(B)(1) prohibits "storage," but that term appears within a series of uses described as "fish packing, shipping, canning, processing." Section 212-14(B)(1) plainly uses the noun "fish" as a modifier for the words that follow it. In other words, each of

22

the listed activities—packing, shipping, canning, processing, or storage—pertain to fish. If the Borough intended for storage of <u>any</u> kind to be a prohibited use, it presumably would have included it as a standalone provision, as it did for sidewalk displays in § 212-14(B)(4).

"In interpreting non-exhaustive lists within a statutory scheme, courts may apply a canon of statutory interpretation known as ejusdem generis, which literally means 'of the same kind.'" <u>Williams v. N.J. State Parole Bd.</u>, 255 N.J. 36, 53 (2023) (quoting Norman J. Singer & Shambie Singer, 2A <u>Sutherland Statutory Construction</u> § 47:17, at 364-86 (7th ed. 2022)). Under the ejusdem generis doctrine, "where general words follow specific words in an enumeration describing a statute's legal subject, the general words are constructed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." <u>Ibid.</u> (quoting 2A <u>Sutherland</u> § 47:17, at 364-68). Applying that canon here, we reject defendants' textual argument that Section 212-14(B)(1) disallows storage activities on the premises that do not involve storing fish or fish products.

Fair enough. However, we are nonetheless concerned that storage is not an expressly permitted use within the zone, either.

As noted above, section A lists specific permitted uses such as grocery stores, bakery shops, restaurants, as well as general terms such as "retail shopping facilities" and "business or professional offices." Beach Haven, N.J., Code § 212-14(A). § 212-14(A) also states it permits a "service establishment which supplies commodities or performs a service primarily for residents of the surrounding neighborhood." Beach Haven, N.J., Code § 212-14(A)(2). It is not obvious using a building for commercial storage falls within the general categories of permitted uses in the Code.

Here, there is nothing in the record about the nature of the storage use by plaintiff's former tenant. Other than the Borough's expert's comment that the tenant was using the property for "storage," there is no explanation in the record as to what the tenant's use entailed. If the tenant was using the building to store its own equipment/merchandise, then the storage would arguably not qualify as a "service primarily <u>for residents</u>." <u>Ibid.</u> (emphasis added).

We also take note that the Borough's planner stated at the hearing, without competing expert opinion, that storage is not a permitted use within the zone and required a variance. Although the municipal planner's unrebutted opinion is entitled to some deference, it is not necessarily correct or binding. On the other hand, it is not dispositive that the record lacks proof that plaintiff was cited

for a zoning violation; the illegal use within the premises may have been undetected.

Given these factual and legal uncertainties about the storage issue, we are constrained to remand this matter to the trial court to develop the record and reconsider its subsection (b) analysis. The remand shall be confined to this discrete issue, insofar as it bears upon the "use" element of the provision. If the gas station and auto repair uses were discontinued and then followed by a non-permitted storage use, the application of subsection (b) may be appropriate, depending on the proofs that emerge.[6]

To the extent defendants have raised other points, they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed in part and remanded in part for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

---

[6] We need not address whether other kinds of code violations apart from an illegal use will enable a property owner to avoid a subsection (b) redevelopment designation.

A-3860-23